PEOPLE *v.* WEAVER

Opinion of the Court

1. Searches and Seizures—Fourth Amendment—Meaning.

A core meaning of the Fourth Amendment right of the people to be secure in their persons against unreasonable searches and seizures is that a citizen's privacy shall be respected by the State.

2. Searches and Seizures—Automobiles—Standing—Unlawful Possession.

A defendant, whether or not in lawful possession of an automobile, has standing to object to a search of the car.

3. Searches and Seizures—Without a Warrant—Impounded Automobile—Delayed Search—Immediate Search.

A search without a warrant of an impounded automobile must

–––––––––––––––––––––––––––––––––––––––––––

References for Points in Headnotes

[1] 47 Am Jur, Searches and Seizures § 6 *et seq.*
[2–5, 7] 47 Am Jur, Searches and Seizures § 18.
[2–5, 7, 13–17] Lawfulness of nonconsensual search and seizure without warrant, prior to arrest. 89 ALR2d 715.
[6] 47 Am Jur, Searches and Seizures § 1 *et seq.*
[8–11, 20] 29 Am Jur 2d, Evidence § 411 *et seq.*
[8–11] Modern status of rule governing admissibility of evidence obtained by unlawful search and seizure. 50 ALR2d 531.
[8–11] Federal Constitution as affecting admissibility of evidence obtained by illegal search and seizure. 89 ALR2d 959.
[9–11] 47 Am Jur, Searches and Seizures § 52 *et seq.*
[12] 29 Am Jur 2d, Evidence § 526 *et seq.*
Admissibility of confession as affected by its inducement through artifice, deception, trickery, or fraud. 99 ALR2d 772.
[13–17] 47 Am Jur, Searches and Seizures § 6 *et seq.,* 18.
[18, 19] 7 Am Jur 2d, Automobiles and Highway Traffic §§ 50 *et seq.,* 891 *et seq.*

be made immediately after the car has arrived at the police station to be legal; the police cannot search an impounded automobile at their leisure without a warrant.

4. SEARCHES AND SEIZURES—WITHOUT A WARRANT—IMPOUNDED AUTO-MOBILE—IMMEDIATE SEARCH.

A search without a warrant of an automobile, which had been taken to the police station after defendant's arrest, was illegal, where the search was made two days after the car's arrival at the station, because the search was not an immediate search.

5. SEARCHES AND SEIZURES—WITHOUT A WARRANT—IMPOUNDED AUTO-MOBILE—IMMEDIATE SEARCH—PROBABLE CAUSE.

The legality of a search without a warrant of an automobile was the issue to be decided, not the existence of probable cause to search, where the police, after having arrested the defend-ant, took the car defendant was driving to the police station, the car had been stopped because it had had stolen license plates, the defendant claimed that he had borrowed the car from a friend, the police, after being unable to locate the friend, made a search without a warrant of the car two days after defendant's arrest, because, even assuming that there was probable cause, the search was not immediate.

6. SEARCHES AND SEIZURES—WITHOUT A WARRANT—CONSTITUTIONAL LAW.

Searches with warrants are the rule; searches without warrants, the exception.

7. SEARCHES AND SEIZURES—WITHOUT A WARRANT—IMPOUNDED AUTO-MOBILE—DELAYED SEARCH.

A search without a warrant of an automobile made at the police station two days after the defendant's arrest and the car's impoundment was illegal as not an immediate search; the necessity which justifies on-scene searches and, by extension, immediate station house searches, does not apply to a search two days after arrest.

8. SEARCHES AND SEIZURES—ILLEGAL SEARCH—DERIVATIVE EVIDENCE —SUPPRESSION.

Evidence derived from evidence discovered during an illegal search and seizure is subject to possible suppression if the police could reasonably have foreseen that by engaging in their illegal behavior they might obtain evidence of the kind which they did obtain.

9. Searches and Seizures—Illegal Search—Derivative Evidence —Suppression.

Derivative evidence consisting of the information that the defendant had committed an armed robbery, the crime the defendant was convicted of, and the name of the man robbed, the principal witness against the defendant, was the type of evidence the police could reasonably have foreseen that they would obtain when they illegally searched the glove compartment of the car defendant had been driving when arrested where the defendant had been arrested because the car had stolen license plates on it, the defendant had told the police that he had borrowed the car from a friend, and the police had been unable to locate the friend, because when the police looked in the glove compartment they were clearly looking for the name of the automobile's owner.

10. Searches and Seizures—Illegal Search—Derivative Evidence —Suppression—Evidentiary Hearing.

Evidentiary hearing was necessary to determine whether derivative evidence from an illegal search, which gave the police knowledge that the defendant had committed armed robbery and the name of the robbery victim, would have been discovered by the police even if they had not conducted the illegal search where the police, in a legal search, had obtained the automobile's serial number and sent out teletypes requesting identification of the owner.

11. Criminal Law—Warning of Rights—Impermissible Questioning—Illegally-Seized Evidence—Appeal and Error.

Whether police officers' showing the defendant the evidence against him after the defendant had said he didn't want to give a statement violated the defendant's right to remain silent during interrogation need not be decided where the case was remanded for an evidentiary hearing on whether derivative evidence should be suppressed and the evidence shown to the defendant was the same derivative evidence.

12. Evidence—Confessions—Admissibility.

A confession may be inadmissible if it is obtained after the defendant is confronted with illegally-obtained evidence.

Dissent by O'Hara, J.

13. Searches and Seizures—Automobiles—Illegal Possession— Fourth Amendment.

*The Fourth Amendment protection against unreasonable searches*

*should not be afforded to a person in manifest illegal posses-
sion of an automobile in which he had absolutely no proprie-
tary or possessory interest (US Const, Am 4).*

14. SEARCHES AND SEIZURES—AUTOMOBILES—ILLEGAL POSSESSION—
FOURTH AMENDMENT.
   *Protection against illegal searches and seizures did not extend
   to the automobile defendant was driving where the automobile
   had stolen license plates on it and the defendant had no evi-
   dence of title or right of possession to the vehicle.*

15. SEARCHES AND SEIZURES—WITHOUT WARRANT—AUTOMOBILES—
DELAYED SEARCH.
   *A search without a warrant of an impounded vehicle within two
   days after the car's seizure, for the purpose of establishing
   ownership, is an immediate search for Fourth Amendment
   purposes, because the diffused responsibilities of a modern
   metropolitan police department with its necessary differing
   areas of procedural authority makes it unrealistic to require
   personnel from various divisions to drop everything to con-
   centrate upon a search of one car at the time of the arrest
   of one defendant.*

16. SEARCHES AND SEIZURES—SEARCH—AUTOMOBILES.
   *Police officer's opening an unlocked glove compartment of a
   stolen car, which has been impounded, to look for some evi-
   dence of ownership does not constitute a search for Fourth
   Amendment purposes.*

17. SEARCHES AND SEIZURES—AUTOMOBILES—STOLEN AUTOMOBILE.
   *No search of an automobile made by police officers who have
   reasonable cause to believe the automobile has been stolen is
   prohibited by the Fourth Amendment.*

18. AUTOMOBILES—REGISTRATION REQUIREMENTS—JUDICIAL NOTICE.
   *Automobiles are required to be registered with the Secretary of
   State showing the name and address of the owner; judicial
   notice is taken of this fact.*

19. AUTOMOBILES—REGISTRATION REQUIREMENTS—IDENTITY OF OWN-
ER—JUDICIAL NOTICE.
   *Judicial notice is taken of the fact that police officers who send
   teletypes, giving the serial number of a stolen automobile
   and requesting the name of the car's owner, will learn the
   identity of the owner of the automobile, because automobiles
   are required to be registered with the Secretary of State.*

20. SEARCHES AND SEIZURES—ILLEGAL SEARCH—AUTOMOBILES—UN-
LAWFUL POSSESSION—STANDING.

> *A defendant lacked standing to object to the admission of the testimony of the owner of an automobile stolen by the defendant where the police learned of the identity of the owner by looking, without a warrant, in the unlocked glove compartment of the automobile two days after the car's impoundment because, even assuming the search was illegal, only the owner of the car had standing to object.*

Appeal from Recorder's Court of Detroit, Henry Heading, J. Submitted Division 1 January 13, 1971, at Detroit. (Docket No. 9226.) Decided August 24, 1971. Leave to appeal denied, 386 Mich 766.

Dennis L. Weaver was convicted of armed robbery. Defendant appeals. Remanded with instructions.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *William L. Cahalan,* Prosecuting Attorney, *Dominick R. Carnovale,* Chief, Appellate Department, and *Thomas R. Lewis,* Assistant Prosecuting Attorney, for the people.

*Albert Summer,* for defendant on appeal.

Before: FITZGERALD, P. J., and LEVIN and O'HARA,* JJ.

LEVIN, J. The defendant, Dennis L. Weaver, appeals his conviction by a jury of the offense of armed robbery.[1]

The people's evidence tended to show that Weaver stole a 1967 Cadillac automobile and money from the

---

* Former Supreme Court Justice, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

[1] MCLA § 750.529 (Stat Ann 1971 Cum Supp § 28.797).

owner of the automobile and a friend of the owner at gunpoint in Detroit.

Two weeks after the robbery Weaver was stopped by police officers in Cleveland, Ohio while he was driving the stolen Cadillac automobile. He was stopped because the automobile was bearing license plates which had been reported stolen. Weaver disclaimed ownership of the automobile and informed the officers that he had borrowed it from a friend. Weaver was arrested, the automobile was searched at the scene, and a gun was found in the glove compartment. The automobile was removed to the police garage.

Two days after Weaver's arrest, police detectives, unable to locate the man who allegedly had lent the automobile to Weaver, made a search without a warrant of the impounded automobile. In the glove compartment they found a service book with the serial number of the automobile and the name of the owner and his Detroit, Michigan address. In response to a teletype sent to Detroit, the Cleveland authorities learned that the automobile had been stolen during a robbery.

A week later, a Detroit police detective met with Weaver in the county jail in Cleveland and advised him of his constitutional rights. Weaver signed a *Miranda*[2] warning form, and refused to make a statement. At the time he had an attorney in Cleveland, but had not as yet obtained counsel in Detroit.

The Detroit police detective and Weaver left for Detroit arriving that afternoon. The following morning the police detective summarized for Weaver the evidence which had been assembled tending to establish his guilt and asked him whether he now

[2] *Miranda* v. *Arizona* (1966), 384 US 436 (86 S Ct 1602, 16 L Ed 2d 694, 10 ALR3d 974).

wished to make a statement. Weaver then gave a confessional statement after having been again advised of his constitutional rights. The trial court ruled that the confession was admissible.

## I.

Mr. Justice Stewart recently observed for a plurality (himself and three other justices) of the United States Supreme Court:

"As in every case, our single duty is to determine the issues presented in accord with the Constitution and the law." *Coolidge* v. *New Hampshire* (1971), 403 US 443, 445 (91 S Ct 2022, 2027; 29 L Ed 2d 564, 570) (*per* Justices Stewart, Douglas, Brennan, and Marshall).

A core meaning of the Fourth Amendment right of the people to be secure in their persons against unreasonable searches and seizures is that a citizen's privacy shall be respected by the State. "The principal object of the Fourth Amendment is the protection of privacy rather than property, [and the United States Supreme Court has] increasingly discarded fictional and procedural barriers rested on property concepts." *Warden, Maryland Penitentiary* v. *Hayden* (1967), 387 US 294, 304 (87 S Ct 1642, 1648; 18 L Ed 2d 782, 790).

It is, therefore, clear that no distinction can properly be made based on whether the defendant was lawfully in possession of the automobile that was searched. See *Williams* v. *United States* (CA 5, 1969), 412 F2d 729, and *Glisson* v. *United States* (CA 5, 1969), 406 F2d 423, holding that a defendant in a criminal case from whose possession a stolen automobile was taken by the police has standing to complaint of a later search of the impounded vehicle. See, also, *Warden, Maryland Penitentiary* v. *Hayden, supra,* p 307.

In the recent *Coolidge* case, at the same time that Coolidge was arrested his automobile was seized pursuant to an *invalid* search warrant. The vehicle was subsequently towed to the police station where, two days later and on two occasions the following year, it was searched. Vacuum sweepings from the automobile were held to be inadmissible and his conviction was reversed:

> "the most basic constitutional rule in this area is that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.' The exceptions are 'jealously and carefully drawn,' and there must be 'a showing by those who seek exemption * * * that the exigencies of the situation made that course imperative.' '[T]he burden is on those seeking the exemption to show the need for it.' In times of unrest, whether caused by crime or racial conflict or fear of internal subversion, this basic law and the values that it represents may appear unrealistic or 'extravagant' to some. But the values were those of the authors of our fundamental constitutional concepts. In times not altogether unlike our own they won—by legal and constitutional means in England, and by revolution on this continent—a right of personal security against arbitrary intrusions by official power. If times have changed, reducing every man's scope to do as he pleases in an urban and industrial world, the changes have made the values served by the Fourth Amendment more, not less, important. * * *

"The word 'automobile' is not a talisman in whose presence the Fourth Amendment fades away and disappears." *Coolidge* v. *New Hampshire* (1971), 403 US 443, 454–455, 461 (91 S Ct 2022, 2032, 2035; 29 L Ed 2d 564, 576, 580) (*per* Justices Stewart, Douglas, Brennan and Marshall).

In *Carroll* v. *United States* (1925), 267 US 132, 156 (45 S Ct 280, 286; 69 L Ed 543, 552), the United States Supreme Court ruled that the police may search a vehicle without a warrant if "the seizing officer shall have reasonable or probable cause for believing that the automobile which he stops and seizes has contraband liquor therein which is being illegally transported".

In *Chambers* v. *Maroney* (1970), 399 US 42 (90 S Ct 1975, 26 L Ed 2d 419), the Court ruled, as explicated in *Coolidge,* that "where the police may stop and search an automobile under *Carroll,* they may also seize it and search it later at the police station".[3]  It was also observed in *Coolidge* that in *Preston* v. *United States* (1964), 376 US 364 (84 S Ct 881, 11 L Ed 2d 777), the Court had made plain that the police "could not legally seize the car, remove it, and search it *at their leisure* without a warrant".[4]  (Emphasis supplied.)  This was also made plain in *Chambers* v. *Maroney* (p 52); the Court there emphasized that a search of an automobile at the station house without a warrant must be "immediate".  (In two separate places the Court used the phrase "immediate search without a warrant".)  The word "immediate" must, therefore, be given meaning.  "Immediate" could mean immediately upon arrival of the automobile at the station house.  If that is what it means—and that is how we read it—then the second search here conducted, two days after the automobile was seized, was not an immediate search and, therefore, was not a search validated or approved in *Chambers.*

---

[3] *Coolidge* v. *New Hampshire* (1971), 403 US 443, 463 (91 S Ct 2022, 2036, 29 L Ed 2d 564, 581) (*per* Justices Stewart, Douglas, Brennan, and Marshall).

[4] *Coolidge* v. *New Hampshire, supra,* 403 US 457 (91 S Ct 2033, 29 L Ed 2d 577).

The defendant Weaver told the police that the apparently stolen automobile had been lent to him by a named individual. The police attempted to locate that individual, but were unable to do so. When Weaver's proffered exculpatory statement could not be verified, the police had more reason to believe that the automobile was, indeed, stolen; the evidence of the stolen plates and their inability to verify the defendant's exculpatory statement again gave them probable cause to search the automobile. It is arguable that since the police, "immediately" upon concluding that the exculpatory statement could not be verified, searched the automobile for the second time, the second search was, within the meaning of *Chambers,* an immediate search.

The issue before us is not, however, whether there was probable cause to make the second search— there was. See *Warden, Maryland Penitentiary* v. *Hayden, supra,* p 307. The issue is whether the second search could be conducted without a warrant.

In *Chambers* the Court dispensed with the warrant requirement in a situation where the alternatives facing the police were to search on the street at the scene without a warrant or to search at the station house with or without a warrant. If a warrant were required for station house searches, which could be conducted without a warrant at the scene of an arrest, a premium would be placed on conducting the search at the scene. Rather than compel the police to search at the scene, in many cases at considerable physical risk, the Court gave them a blank check for an "immediate" search at the station house. That blank check can, however, only be filled in "immediately" upon arrival at the station house.

After the expiration of the "immediate" segment of time, the blank check expires. Thereafter, a warrant must be obtained *even though there is*

*probable cause,* and even though there may be little difference between searching without a warrant and continuing to hold the automobile until a search warrant can be applied for and obtained. The Court did not validate delayed searches without a warrant.

The primacy of the warrant requirement has been consistently emphasized by the United States Supreme Court. Many times it has said that warrants are the rule, warrantless searches the exception. *Vale* v. *Louisiana* (1970), 399 US 30, 34 (90 S Ct 1969, 1972; 26 L Ed 2d 409, 413); see quotation from *Coolidge* v. *New Hampshire, supra.* See also *People* v. *Trudeau* (1971), 385 Mich 276, 280. The necessity which justifies on-scene searches, and by extension immediate station house searches, simply does not apply to a search two days after the arrest. Two days afterwards there is no necessity. All that is then at stake is the convenience of the police; it is inconvenient, time-consuming to apply for a warrant.

In excusing a warrantless search at the station house, the majority in *Chambers* argued that the infringement on the defendant's rights by such a search could not be said to be greater than the infringement caused by the detention of the automobile until a warrant could be obtained. Here, two days had passed. The additional intrusion caused by a few hours' delay while a warrant is sought no longer outweighs the disadvantage to the defendant of not requiring a determination by an independent judicial officer before a search is made. Particularly where, as here, the defendant is in jail, there can be no advantage to him in dispensing with the warrant requirement. He is not, in the vernacular, "going anyplace". There is no inconvenience to him, only to the people, in delaying the search until a warrant can be obtained.

In *People* v. *Miller* (1970), 26 Mich App 665, we sustained a warrantless search of an automobile conducted at the police station. However, there, like *Maroney* and unlike here, the search was conducted immediately upon arrival at the police station.

## II.

It is also necessary to consider whether suppression of the illegally-seized evidence requires a new trial. The second and illegal search of the glove compartment revealed the name of the automobile's owner. This led to the owner who informed the police that the automobile had been stolen from him by Weaver during the commission of an armed robbery. Thus, knowledge that Weaver had committed the crime of which he was convicted and now appeals and of the principal, perhaps essential, witness against him was derived from the illegally-seized evidence.[5]

In *People* v. *Roderick Walker* (1970), 27 Mich App 609, 617, we ruled that in deciding whether derivative evidence, too, must be suppressed we had to consider "whether it was reasonably foreseeable by the police when they acted that by engaging in the illegal behavior they might obtain evidence of the kind they obtained". Clearly, when the police looked in the glove compartment of the automobile they were looking for evidence that would lead them to the name of the owner of the automobile. They obtained the very evidence they sought.

The question then becomes whether the connection between the illegal behavior and the evidence that

[5] That a witness may be fruit of a poisoned tree, and his evidence suppressed, see *McLindon* v. *United States* (1964), 117 App DC 283 (329 F2d 238); *United States* v. *Tane* (CA2, 1964), 329 F2d 848; *Williams* v. *United States* (CA5, 1967), 382 F2d 48.

Weaver had committed the offense of armed robbery
was, in the words of the United States Supreme
Court in *Nardone* v. *United States* (1939), 308 US
338, 341 (60 S Ct 266, 268; 84 L Ed 307, 312), suffi-
ciently "attenuated as to dissipate the taint."    In
*Wong Sun* v. *United States* (1963), 371 US 471, 488
(83 S Ct 407, 417; 9 L Ed 2d 441, 455), the Court
said that in deciding that question it is necessary to
consider "whether, granting establishment of the
primary illegality the evidence to which instant
objection is made has been come at by exploitation
of that illegality or instead by means sufficiently
distinguishable to be purged of the primary taint."
In the seminal case of *Silverthorne Lumber Co.* v.
*United States* (1920), 251 US 385, 392 (40 S Ct
182, 183; 64 L Ed 319, 321, 24 ALR 1426), the Court
said that the inhibition on the use of derivative evi-
dence would not apply if it could be proven that the
government learned of the evidence "from an inde-
pendent source".[6]

To decide whether the derivative evidence ob-
tained in this case—evidence tending to show that
another crime had been committed—should be sup-
pressed, it is necessary to remand for the taking of
further evidence.  The record shows that the police,
as a result of the legal search immediately upon
arrival of the automobile at the police station, ob-
tained the automobile's serial number and sent out
teletype requests for identification of the owner.  It
may, therefore, appear upon the taking of further
evidence that the police would have learned the name
of the owner even if they had not searched the glove
compartment.

---

[6] Similarly, *Alderman* v. *United States* (1969), 394 US 165, 183
(89 S Ct 961, 972; 22 L Ed 2d 176, 192), *reh den* 394 US 939 (89
S Ct 1177, 22 L Ed 2d 475).

### III.

Weaver also asserts that the confessional statement was not admissible because the police acted unlawfully in continuing to interrogate him after he had indicated he did not wish to make a statement.

In *Miranda* v. *Arizona* (1966), 384 US 436, 473, 474 (86 S Ct 1602, 1627, 1628; 16 L Ed 2d 694, 723, 10 ALR3d 974), the United States Supreme Court declared:

"Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise."

In this case, Weaver claims that the "compulsion" was not subtle at all, and to some extent his version of the facts is borne out by the testimony of the police officers themselves. While the officers denied Weaver's assertion that they promised him he would be dealt with more leniently if he confessed, they conceded that after he had declined to give a statement they showed him the evidence that they had assembled tending to show that he had committed the crime of armed robbery.

Courts in other jurisdictions have divided on the question whether the police may, consistent with *Miranda,* interrogate an accused person after he has declined to give a statement.[7]

---

[7] Compare *People* v. *Fioritto* (1968), 68 Cal 2d 714 (68 Cal Rptr 817, 441 P2d 625), with *State* v. *Godfrey* (1968), 182 Neb 451 (155 NW2d 438) and *State* v. *Bishop* (1968), 272 NC 283 (158 SE2d 511). *Cf. Combs* v. *Commonwealth* (Ky, 1969), 438 SW2d 82, 85.

In ruling in this case that the confession was admissible the trial judge did not specifically find whether Weaver, after first having declined to give a statement, "voluntarily" waived his constitutional rights or whether the statement which he gave was the result of impermissible procedures.

Under all the circumstances, we are not obliged to express an opinion as to the propriety of the continued interrogation of Weaver. The confession which he gave might be inadmissible because it was obtained after he was confronted with the evidence that the automobile was stolen. *Fahy* v. *Connecticut* (1963), 375 US 85, 90, 91 (84 S Ct 229, 11 L Ed 2d 171). See *People* v. *Hendricks* (1969), 25 NY2d 129, 138 (303 NYS2d 33, 40; 250 NE2d 323, 328); *People* v. *Johnson* (1969), 70 Cal 2d 541 (75 Cal Rptr 401, 450 P2d 865); *Ruiz* v. *Craven* (CA 9, 1970), 425 F2d 235; *United States* v. *Ricci* (ED Pa 1970), 313 F Supp 31, 34; *United States* v. *Small* (D Mass, 1969), 297 F Supp 582, 586. There would then be no need to decide whether the confession was obtained in violation of Weaver's *Miranda* rights.

We remand for further proceedings not inconsistent with this opinion.

FITZGERALD, P. J., concurs in result only.

O'HARA, J. (*dissenting*). I am in most vigorous disagreement with my colleagues. I dissent on three grounds.

First, it is to me incredible that the awesome protection of the Fourth Amendment should be afforded to one in manifest illegal possession of an automobile, and one in which he had absolutely no proprietary or possessory interest. It has been and remains the law, as I understand it, that "the Fourth Amendment protects people, not places". *Katz* v. *United*

*States* (1967), 389 US 347, 351 (88 S Ct 507, 511; 19 L Ed 2d 576, 582). How the language that the "right of the people to be secure in their persons, houses, papers and effects" can be torturously extended to one driving a motor vehicle with stolen license plates and by one who had no evidence of title or right of possession, escapes me. I am aware of no holding by the United States Supreme Court of such an extension of the Fourth Amendment protection, and certainly none such as appears in any of the cases cited by my associates. This Court, however, spoke directly to the point in *People* v. *Lovins* (1968), 10 Mich App 524, 526.

"The defendant did not have any proprietary or possessory interest in the automobile searched * * * . Under such facts the defendant did not have any standing to raise the legality of the search and seizure."

Judge FITZGERALD quoted the general rule from which the holding stems with approval in his authored opinion in *People* v. *Hale* (1967), 7 Mich App 127, 132.

" 'The immunity to illegal searches and seizures is a personal privilege, and evidence wrongfully obtained * * * is not incompetent against accused where the unlawful search and seizure was of the person or property of a third person.' "

By including this excerpt, I do not mean to imply that I hold the search in this case was unlawful, I quote it rather to the point of "what if it were unlawful, what difference does it make?" Obviously, the defendant could not raise it.

I am also somewhat at a loss to understand this excerpt from the majority opinion,

"The issue before us is not, however, whether there was probable cause to make the second search

—there was. [Citation omitted.] The issue is whether the second search could be conducted without a warrant."

I read the majority-cited *Chambers* v. *Maroney* differently than do my associates. The only difference is that I think it stands for the exact converse of the majority's application thereof. Since the majority concedes the existence of probable cause to make a search without a warrant at the time and place of the arrest, I cannot read out of *Chambers,* what seems to me to be rather clear language of *Chambers* and hardly *obiter dictum*:

"On the facts before us, the blue station wagon could have been searched on the spot  *  *  *  *The probable cause factor still obtained at the station house  *  *  *  *  ." (Emphasis added).

Second, I challenge the holding that a search of an impounded vehicle 48 hours after it was seized is not "immediate" in the terms of *Preston* v. *United States* (1964), 376 US 364 (84 S Ct 881, 11 L Ed 2d 777) and *Chambers* v. *Maroney* (1970), 399 US 42 (90 S Ct 1975, 26 L Ed 2d 419). It seems to me, so to hold is to disregard completely the diffused responsibilities of a modern metropolitan police department with its necessary differing areas of procedural authority. We are not here dealing with a small town constable, or a sheriff in a small county where the lockup, the vehicle impoundment area, the identification bureau, and the administrative section are in a four or five cell jail with a back yard parking area—and the whole operation staffed by one or two persons. To hold that detectives, patrol car drivers, clerk typists, and impoundment personnel must all drop everything each is doing at the time of one arrest and concentrate upon the search of one

car to determine ownership instanter, is utterly un-realistic. Nowhere do I find that under the fact situation here any United States Supreme Court decision holds that a search of an impounded vehicle made within two days after its seizure, and during an effort to establish ownership, is not "immediate."

In the third place, there was no search. This was pointedly established in *People* v. *Eddington* (1970), 23 Mich App 210, 225:

"A 'search' in the constitutional sense implies a 'prying into hidden places for that which is con-cealed and that the object searched for has been hidden or intentionally put out of the way.' * * * Such a definition recognizes the gist of the protec-tion afforded by the Fourth Amendment—protection of the individual from unreasonable invasion of privacy."

I cannot read in the foregoing precedent any pro-hibition against police officers opening an unlocked glove compartment of a stolen car to look for some evidence of ownership, whether done two days or two weeks after impoundment.

If all the foregoing is not sufficient to establish that no search violative of the Fourth Amendment was made, we turn to *People* v. *Henderson* (1967), 6 Mich App 379, which clearly holds that *any* search is not proscribed when the officers have reasonable cause to believe the automobile was stolen. No time limit is included. In this case, the stolen status of the motor vehicle was and remains incontestable.

In finality, I am utterly confounded by the deci-sional disposition of the case under the extant fact situation. What possible legal, constitutional, or precedential service can be rendered by remanding this cause, under this language quoted from the majority opinion?

"To decide whether the derivative evidence obtained in this case—evidence tending to show that another crime had been committed—should be suppressed, it is necessary to remand for the taking of further evidence. The record shows that the police, as a result of the legal search immediately upon arrival of the automobile at the police station, obtained the automobile's serial number and sent out teletype requests for identification of the owner. It may, therefore, appear upon the taking of further evidence that the police would have learned the name of the owner even if they had not searched the glove compartment."

If we cannot take judicial notice of the fact that automobiles require registration with the Secretary of State, showing the name and address of the owner, and that absent the perfectly normal, legal, routine inspection of a glove compartment that turned up the name and address of the owner, the police could not have otherwise learned it, we can take judicial notice of nothing.

There is no error. There is nothing to remand for. The defendant was convicted in a trial in which no claim of error was made save admission of the "tainted" testimony of the owner of the vehicle that the defendant robbed him at gunpoint. The "taint" was the finding by the police of the owner's name in the unlocked glove compartment in his own vehicle. The only person with standing to raise the defense of illegal search in this case was the car owner, Mr. Gibson. He did not. If asked about it, I am sure he would have approved it.

So this "search" is violative of the robber's constitutional protection against the unreasonable search and seizure of *his* "person, house, papers or effects?" I cannot agree.

I vote to affirm.